KEITH v. CITY OF CAVE SPRINGS.

5-2314                                              344 S. W. 2d 591

Opinion delivered March 27, 1961.

*Crouch, Jones, Blair & Cypert,* for appellants.

*Wade & McCallister,* for appellee.

JIM JOHNSON, Associate Justice. This appeal involves a mandatory injunction. Prior to September 9, 1950, the water supply and distribution system of the City of Cave Springs consisted of individual wells and pressure pumps. No city water service was available.

On September 9, 1950, the City entered into a 25 year contract prepared by E. L. Keith whereby the latter agreed to sell and deliver to the City water suitable for industrial and domestic consumption under pressure at a gate valve in the street near the northwest corner of Lake Keith (a small impounded body of water fed by a spring known as Cave Springs) at the rate of twenty cents (20¢) per thousand gallons. The contract which was duly recorded on May 7, 1951, among other things, provided that E. L. Keith would "promptly repair any part of his equipment that might fail to deliver the water to the City"; and that Keith would "install and maintain an automatic chlorinator to purify said water so sold." The contract further provided that Keith would furnish "all the water that said City wishes to purchase, subject to the capacity of his present pumping facilities,"

and "if anything should happen to the spring so it will not furnish good water in sufficient quantity to operate the water wheel and supply the need of the City, that E. L. Keith is not bound to purchase additional equipment."

The water originally acquired by the City under its contract with E. L. Keith flowed by gravity from the mouth of Cave Springs, passed through a trough and dropped downward from the end of the trough onto a water wheel located in front of the spring. A shaft extended from the water wheel into a well house where the valves, belts, and other mechanisms of a pump were housed. The turning of the water wheel pumped the water up into a storage tank situated on the top of a hill above the spring. From the storage tank, the water was pumped into an adjoining tower tank from where it flowed to the gate valve and thence into the City's distribution lines.

At the time the contract was entered into, E. L. Keith was the owner of a small resort area known as Lake Keith Resort consisting principally of the spring, the lake, some dwellings, fish hatchery, apartment houses, and other resort facilities. Water for these installations flowed through private water distribution lines owned by Keith from the same water storage tank which supplied the City.

In 1950 the City had 10 to 15 water customers and its own distribution system consisted of one water main extending from Lake Keith down main street through the business district to the north end of the city limits. A year later Keith loaned the City money to extend the City's distribution lines to the south end of town and to other places within the City.

Keith soon discovered that the water wheel would not turn fast enough in the dry summer months when the spring was low to force enough water into the elevated storage tank to supply the needs of the City as well as the needs of the Lake Keith Resort occasioned by the construction of a swimming pool. In the words of

E. L. Keith, ''I knew the City was using out of it and me using and the spring low, well we had to have some other kind of facilities to pump enough water during that real dry year.''

On or about 1952 or 1953, Keith voluntarily installed an electrical pump, which also activated the chlorination process in the well house to work in conjunction with the existing water wheel. From that time until on or about August of 1959, both the water wheel and the electric pump working together or separately forced enough water into the water storage tank to supply all of the needs of Lake Keith Resort, which included a fish hatchery, apartment houses, filling station, cafe, swimming pool, and other dwellings, obtaining water through Keith's private distribution lines, and all of the needs of the City which included a school, business and residential establishments, chicken raisers, the City's own fire department and other water users.

Keith operated the water supply system and related pumping facilities and supplied water to the City and to the Lake Keith Resort installations without incident from September 9, 1950, to February 15, 1957, when he and his wife sold and conveyed to Joe M. Meyer and Wilma B. Meyer, husband and wife, the real estate upon which Lake Keith Resort and said water supply system, pumping facilities, swimming pool, storage tanks and other installations were located. The Meyers likewise operated the water supply system and related pumping facilities and supplied water to the City and to Lake Keith Resort installations without incident from February 15, 1957, to June 14, 1957, when they conveyed the same premises to the Northside Supply and Development Company, a Missouri corporation, which also operated the water supply system and related pumping facilities and supplied water to the City and to Lake Keith Resort installations without incident until August 1959.

The owners and incorporators of the Northside Supply and Development Company were Paul Johnson

and Eurtis Johnson, residents of Springfield, Missouri, brothers of F. D. (Dee) Johnson, one of the defendants herein. Dee Johnson had arranged with his brothers to live in a room in a hotel at the resort owned by his brothers and to assist Chester McCamey who was in charge of the water system and related pumping facilities; Dee Johnson arrived to assume his duties at the resort on or about the middle of August 1959; he spent part of his time at the resort and part of his time in Springdale; he had authority from the Northside Supply and Development to receive check payments for water purchased by the City of Cave Springs from the water supply owned by the Northside Supply and Development Company, to endorse the checks, to get the cash on them and to deposit them in a bank at Bentonville, Arkansas, in an account owned by the Northside Supply and Development; in addition, he had authority to superintend the building of houses in Springdale and vicinity for Northside Supply and Development Company, to hire laborers, to fire them, and to pay their wages either from checks drawn by him on the same bank account or from the proceeds received from the checks received from the City and endorsed by him. Mr. Keith characterized the relationship of Dee Johnson and Northside Supply and Development Company as follows: "He is their agent here, working for them and building some houses over there is all I know."

Ex-Mayor Bright, who had signed the contract in 1950 for the City, testified that the first report he had of a shortage of water was in August or September of 1959.

Wilbur Bolin, member of the Cave Springs City Council and Water Commissioner, testified that water users in the City had been out of water several times in the last six or eight months; that upon investigation he would find the pump shut off and the water tower dry; that he would talk to Dee Johnson about it and that eventually Johnson would get the pump started again; that this happened a lot of times twice a week; that the school had been out of water several times; that on

Wednesday, April 13, 1960, he found there wasn't any water—that the boy (Johnson) went in there and turned some valves on, opened the water to where more would pour on the wheel but in about an hour and a half later the people would call and report that they were still out of water; that both Mrs. Pattishall and Ed Curtis reported to him that they were out of water; that Mrs. Pattishall lives east of the school house and Ed Curtis lives south of the school house; that they live on about the same elevation as the water tank and the school—all on high ground; that the City has never run out of water except when the storage tank was dry; that on one occasion he found the electric pump shut off and observed the storage tank empty; that he and others would go get Dee Johnson when this occurred and get the pump turned on; that these incidents of water shortage occurred a dozen or two dozen times; that on the first two or three occasions when he talked to Mr. Johnson about it, Mr. Johnson's answer was, in substance, that he was losing money on it; that the operation of the electric pump by itself was probably sufficient to keep the water storage tank full; that water shortage troubles were encountered on April 9, April 13, and April 14, 1960; that he has visited the spring several times when the trough that directed the water on to the water wheel was placed in such a manner that the water was running over the top of the water wheel without touching it; that he has visited the spring when neither the water wheel nor the electric pump were working.

Mayor Pearson testified that he told Mr. Johnson that he would like to have some water because the school children were out of water; that on one occasion he couldn't find Dee Johnson and neither the water wheel nor the electric pump were running; that he made a visit to the pumps on Saturday, April 9, 1960, and that the water wheel was off, the moss and vegetation on the wheel were dry, the electric pump was running but there was no water in the tower; that on Wednesday, April 13, 1960, he made a trip to the spring because "we were out

of water'' and found that the electric pump ''wasn't pumping if it was running and the water wheel was running but wasn't pumping''; that last Saturday ''the water wheel was not running, the electric pump was running but it didn't sound like it was pumping and there was no water.''

E. L. Keith testified that Mr. Johnson had had to make repairs to the electrical pump that he installed; that when there was no water in the tank the people living on high ground would not get water; that although he did not feel bound by the terms of the contract to do so, he purchased the electrical pump to work in conjunction with the water wheel; that the City used the money he lent them to expand the water distribution system; that in connection with the expansion of the water distribution system and the running of water from his water supply into the newly expanded system, there was no understanding between him and the City as to whether his original contract would cover the expanded system; the City continued to pay him at the contract rate for the water that went into the new system as well as the entire system as a whole.

Dee Johnson admitted that the water wheel wouldn't keep the water supply up; that part of the time Chester McCamey would kick the electric pump in to increase the supply; that Northside Supply and Development Company had the fish hatchery leased; that even after a temporary injunction was served on him, he closed the valve where the water comes through the water pump to shut the water wheel down and let the trough down so that the water ran over the top of the water wheel; that he did this because there wasn't any need for the water wheel if the electric pump was running; that he was told by his brothers that just the water wheel itself would furnish plenty of water; that he was employed by Northside Supply and Development Company; that he receives a salary from Northside Supply and Development; that he had knowledge of the fact that people in Cave Springs had been out of water; that on November 17, 1959, he learned that the school was out of water; that

when he learned this, he just figured there wasn't enough water in the tank to supply them; that the school is on higher ground; that the water wheel simply was not putting enough water into the storage tank to furnish sufficient water.

On November 19, 1959, the Benton Chancery Court entered a temporary restraining order restraining and enjoining E. L. Keith, Eurtis Johnson, Paul Johnson, Dee Johnson, and Northside Supply and Development Company, a Missouri corporation, their agents, servants, and/or employees from directly or indirectly in any way shutting off or interfering with the electrical power supply for the electric pump which pumps water from Lake Keith at Cave Springs to the elevated water storage tank which supplies water for industrial and domestic water users of the City of Cave Springs, Arkansas; that on April 14, 1960, the Benton Chancery Court entered an order making the temporary restraining order entered on November 19, 1959, permanent as against the defendants, Dee Johnson and Northside Supply and Development Company, a Missouri corporation, their agents, servants and/or employees, be enjoined to maintain the supply of water to the City of Cave Springs, Arkansas, not only by the electrical means currently employed, but by means of the existing water wheel or both, or either, as the case may be; the Northside Supply and Development Company was further directed by the court to maintain said pumps in a reasonable state of repair.

We note from the record that the order of the trial court entered April 14, 1960, states that the temporary restraining order entered on November 19, 1959, is made permanent as against the defendant E. L. Keith; however, the order further states that the demurrer of E. L. Keith to the evidence offered by the plaintiff should be overruled. The transcript of the record reflects that the demurrer to the evidence filed by E. L. Keith was actually sustained by the trial court.

In view of this state of the record, the City of Cave Springs on appeal concedes, and we agree, that the trial court's order of April 14, 1960, should be modified so as to vacate the permanent restraining order as against the defendant E. L. Keith.

For reversal appellant relies on four points. We will discuss the points in the order in which they are raised.

### I.

Appellant contends that the Chancery Court did not have jurisdiction of the Northside Supply and Development Company due to improper service upon the corporation.

Service was had upon Dee Johnson as agent for Northside Supply and Development Company, a Missouri corporation.

Section 27-350 of Ark. Stats. (1947) provides:

"Where the defendant is a foreign corporation having an agent in this State, the service may be upon such agent."

Northside Supply and Development Company did not designate its resident agent for service as required by law until January 2, 1960. However, it is well settled that the statutes requiring corporations to appoint an agent upon whom process may be served is not exclusive of other methods of service. See *Lasser Cotton Company* v. *Yates*, 69 Ark. 396, 63 S. W. 997; *Henrietta Mining and Milling Co.* v. *Henry Johnson*, 173 U. S. 221, 19 Sup. Ct. 402, 43 L. Ed. 675; *Meeks* v. *Waggoner*, 191 Ark. 189, 85 S. W. 2d 711.

In the case of *Hot Springs School District No. 6* v. *Surface Combustion Corporation*, 222 Ark. 591, 261 S. W. 2d 769, this Court in discussing methods of obtaining service on non-resident corporations under Section 27-350 of Ark. Stats., supra, said at page 595:

"It was a question of fact for the trial court to decide whether the actions of Dillon, as disclosed by the

evidence, were sufficient to constitute him an agent for service, but the trial court, as indicated above, did not pass on this question.''

In the instant case, the trial court determined as a matter of fact that the nature, character and extent of the actions of Dee Johnson were sufficient to constitute him an agent for service under Section 27-350 of Ark. Stats., *supra*.

Paul and Eurtis Johnson, brothers of Dee Johnson, were the incorporators and principal owners of the Northside Supply and Development Company, a Missouri corporation; Dee Johnson testified he was employed by and received a salary from Northside Supply and Development Company; that Northside Supply and Development Company owned Lake Keith Resort; that he was employed by Northside Supply and Development Company primarily for assisting Chester McCamey, who was employed by Leon Klines, who in turn was employed by Paul and Eurtis Johnson to look after the water supply equipment and electrical equipment at Lake Keith; that his brothers were the owners of Lake Keith; that they lived at Springfield, Missouri; that he received a place to live in a room at a hotel owned by his two brothers at Lake Keith in exchange for performing his duties as a caretaker for the water supply equipment at Lake Keith; that he moved to Cave Springs on or about August 15th; that he had authority from Northside Supply and Development Company to receive check payments for water purchases by the City of Cave Springs from the water supply owned by the Northside Supply and Development Company; that he had authority from Northside to endorse the checks; to get the cash on them, to deposit them in a bank account (Lake Keith Resort) which is also owned by the Northside Supply and Development Company; to superintend the building of houses in Springdale, Arkansas, for Northside Supply and Development Company, to hire and fire laborers, to pay them their wages by check drawn on the same bank account in Bentonville, Arkansas; Dee Johnson worked part time in Springdale

building houses and part time at Cave Springs with no set number of hours at either place; E. L. Keith testified he sold Lake Keith Resort to the Meyers who in turn sold to the Johnson boys or Northside Supply and Development Company; that it was his intention when he sold the resort that the contract went with it; when asked if he knew whether or not Dee Johnson had any relationship with Northside Supply and Development Company, he testified as follows:

"He is their agent here, working for them and building some houses over there is all I know."

When the water shortage problems developed, it was Dee Johnson to whom the complaints were registered by representatives of the City of Cave Springs, and no one else seemed to have anything else to do with the operation of the pump besides Dee Johnson.

From the facts set out above we cannot escape the conclusion that the finding of the learned Chancellor that Dee Johnson was a proper agent of the Missouri corporation for service under Section 27-350, Ark. Stats., *supra,* was not against the preponderance of the evidence.

## II.

Appellant contends that the contract between E. L. Keith and the City of Cave Springs is not valid and enforceable due to a lack of mutuality of obligation on the part of the City of Cave Springs. To sustain this contention, appellants cite *Magnolia Petroleum Co.* v. *Dudney*, 211 Ark. 469, 200 S. W. 2d 793; *Duclos* v. *Turner*, 204 Ark. 1000, 166 S. W. 2d 251; and *Harrison* v. *Kelly*, 212 Ark. 447, 206 S. W. 2d 184. These cases hold that a contract which leaves it entirely optional with one of the parties as to whether he will perform is not binding upon the other party.

It is true that the contract here involved does not specifically set out an absolute requirement that appellee purchase water from appellant. Even so, the facts in the case at bar do not bring it within the doctrine of the

cases upon which appellee relies. It is unrealistic to say that the City of Cave Springs had an option not to purchase water for its residential and commercial water users from the only source of water supply available to the City.

The term "mutuality of obligation" is merely another way of saying that there must be a valid consideration. *Sargent* v. *Drew English, Inc.,* 12 Wash. 2d 320, 121 P. 2d 373; Corbin, *Contracts* § 152. See also *Meurer Steel Barrel Co.* v. *Martin,* 1 F. 2d 687. We think the applicable rule to such a situation as this is stated in § 157 of Corbin, *Contracts,* especially at the bottom of page 519 where it is stated:

"A promise to supply on stated terms all the goods or services that the promisee may thereafter order is not itself an illusory promise. Instead, it is a very definite promise that creates a large power in the promisee. It is an enforceable promise if the promisee gives any sufficient consideration for it."

Here the promisee agreed to buy water from the appellants and to pay 20 cents per 1,000 gallon for a period of 25 years. There is certainly nothing illusory about people needing water. See also *Linder* v. *Mid-Cont. Petrlm. Corp.,* 221 Ark. 241; 252 S. W. 2d 631.

Moreover, this Court has always held that where a party originally not bound has executed the contract, the doctrine relative to mutuality does not apply. *El Dorado Ice & Planing Mill Co.* v. *Kinard,* 96 Ark. 184, 131 S. W. 460; *Slayden* v. *August Cooperage Co.,* 163 Ark. 638, 260 S. W. 741.

The evidence is undisputed that the City of Cave Springs has for the past ten years diligently fulfilled an implied covenant to purchase water for its residential and industrial consumers and the express convenant to pay for the water purchased. See *Mooney* v. *Gantt,* 219 Ark. 485, 243 S. W. 2d 9. Therefore, appellants cannot be permitted to accept the benefits under the contract and at the same time avoid their obligation

under such agreement. *Williams Mfg. Co.* v. *Strasberg*, 229 Ark. 321, 314 S. W. 2d 500.

### III. & IV.

Appellants contend that the contract between E. L. Keith and the City of Cave Springs was not properly construed by the Chancery Court and that the principle of equitable estoppel should not be invoked. It is admitted that E. L. Keith prepared the contract here in question. Following the settled rule that a contract is construed most strongly against the party who prepares it, *Ark. Valley Royalty Co.* v. *Ark-Okla. Gas Co.*, 222 Ark. 213, 258 S. W. 2d 51, the Chancery Court, in its opinion, made finding that the terms of the contract between E. L. Keith and the City of Cave Springs required Northside Supply and Development Company to supply water to the residents of the City by the operation of either the electric pump or of the water wheel or both, if necessary, and to keep these facilities in a reasonable state of repair.

The two paragraphs of the contract relative to the above findings are as follows:

"The said E. L. Keith agrees to furnish said City all the water that said City wishes to purchase, subject to the capacity of his present pumping facilities."

"It is agreed that if anything should happen to the spring so that it will not furnish good water in sufficient quantity to operate the water wheel and supply the need of the City, that E. L. Keith is not bound to purchase additional equipment."

Certainly these provisions are both clear and unambiguous. There is no evidence that both E. L. Keith and the officials of the City of Cave Springs did not fully understand these provisions upon execution of the contract, it being admitted that the electric pump was not a part of Keith's equipment at the time of such execution.

If there were no other evidence in this record we would have no choice but to reverse the trial court. That

is not the case here. Paragraph 5 of the contract provides:

"The said E. L. Keith agrees to promptly repair any part of his equipment that might fail to deliver the water to said City and he agrees to install and maintain an automatic chlorinator to purify said water so sold."

And when asked how often the water was chlorinated, Dee Johnson replied:

"Well, it's chlorinated at—in conjunction with the electric pump, and when the electric pump kicks in, it puts the chlorine right into the water."

It is undisputed and undenied that Keith was required by the contract to chlorinate the water and the appellant, Dee Johnson, says that the water is chlorinated when the electric pump operates. Therefore, the use of the electric pump was a necessary requirement in the fulfillment of the contract.

In addition it is further undisputed that Keith encouraged the City to expand its water distribution system about the same time that he installed the electric pump in 1952 or 1953 by loaning the City money to expand the system. After the electric pump was installed, the water wheel was used, sometimes by itself, and sometimes the two were used in conjunction with each other to keep the elevated water storage tank sufficiently filled to allow for a gravity flow of water from the tank into the City's expanded distribution system and into the private distribution facilities related to the Lake Keith resort. The record is clear that E. L. Keith and his successor in title fulfilled their contractual obligations during the time they owned the water supply system from the period September 1950 to August 1959 and that the City has likewise fulfilled its contractual obligations for the period from September 1950 to the present day.

When asked why he installed the electric pump, Keith testified:

"I put in the electric pump so my resort wouldn't be out of water in the summer time. I knew the City was using out of it and me using and the spring low, well we had to have some other kind of facilities to pump enough water during that real dry year."

Keith testified that the electric pump was installed in about 1952 or 1953 and the swimming pool was installed before the electric pump; that he had used the water wheel until he put in the swimming pool; that the swimming pool leaks; that the water which leaked from the swimming pool itself was almost as much as the water wheel would supply; that he operates the swimming pool three months in the summer; that the swimming pool was dependent upon the electric pump for an adequate water supply; that with the addition of the electric pump there was enough water for the swimming pool and the City.

In defining "waiver" this Court in *Sirmon* v. *Roberts*, 209 Ark. 586, 588, 191 S. W. 2d 824, 825, approved the following quotations from Corpus Juris, Vol. 67, pages 290, 291:

". . . the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right, or the intentional doing of an act inconsistent with claiming it. Thus, 'waiver' occurs where one in possession of a right, whether conferred by law or contract, with full knowledge of the material facts, does or forbears to do something, the doing of which or the failure or forbearance to do which is inconsistent with the right or his intention to rely upon it."

The record is clear that although E. L. Keith did not consider himself bound by the provisions of the contract relative to installing an electric water pump, he voluntarily installed an electric pump to augment the water wheel. Since "waiver" can be defined as the

voluntary relinquishment of a known right, the situation here presented is a classic example.

From what we have said above, the order of the Benton Chancery Court dated April 14, 1960, is vacated as to E. L. Keith and hereby is affirmed in all other respects except that the perpetual injunction be limited to the balance of the term of the contract.

Modified and affirmed.