HOME LIFE & ACCIDENT COMPANY *v.* SCHEUER.

Opinion delivered February 25, 1924.

1. INSURANCE—FORFEITURE FOR NONPAYMENT OF PREMIUM.—Under a policy of life insurance providing that it should become void on failure to pay premiums when due, the nonpayment of a premium when due *ipso facto* caused a forfeiture of insured's rights.

2. INSURANCE—WAIVER OF FORFEITURE.—Where, after a policy of life insurance was forfeited for nonpayment of a premium, the insurer advised the insured that the policy was still in force, the forfeiture was waived.

3. APPEAL AND ERROR—WEIGHT OF EVIDENCE.—It is for the jury, and not the Supreme Court, to weigh the evidence, determine the credibility of witnesses, and reconcile real or apparent conflicts.

4. APPEAL AND ERROR—CONCLUSIVENESS OF VERDICT.—A verdict sustained by substantial evidence is conclusive on appeal.

5. INSURANCE—EVIDENCE TO SUSTAIN FINDING.—In an action on a life insurance policy, evidence that insured wrote to the insurance company inquiring whether her policy was still in force, and that a letter advising her that the policy was still in force was received in reply thereto, *held* sufficient, in the absence of evidence to the contrary, to justify a finding that the letter was written by the company's authorized officers.

6. INSURANCE—AUTHORITY OF SUPERINTENDENT TO WAIVE FORFEITURE. —The superintendent of an insurance company's life insurance

department and underwriting manager, whose duty it was to pass on the reinstatement of lapsed policies, *held* authorized to waive a forfeiture of a life insurance policy, though the policy provided that only the president, vice president or secretary had power to modify the policy.

7.  INSURANCE—WAIVER OF FORFEITURE.—In an action on a life insurance policy, evidence *held* to warrant a finding that the insurer waived a forfeiture because of nonpayment of premiums, and therefore was estopped to deny liability.

8.  INSURANCE—FORFEITURE.—Where insured inquired whether her policy was still in effect, it was the insurer's duty to inform her with promptness that it would insist on a forfeiture, if such was its intention.

9.  INSURANCE—PENALTY AND ATTORNEY'S FEE.—Under Crawford & Moses' Dig., § 6155, the beneficiary, on recovering on a policy of life insurance, was entitled to recover a penalty of 12 per cent. and reasonable attorney's fees.

Appeal from Arkansas Circuit Court, Southern District; *George W. Clark,* Judge; affirmed.

*T. D. Wynne,* for appellant.

1.   The policies lapsed and became null and void by virtue of the terms of the contracts themselves, on June 8, 1921.   75 Ark. 25; 148 Ark. 199; 112 Ark. 171; 75 Ark. 98; 156 Ark. 77.   Thereafter they could only be reinstated in the method set out in the policies, viz., by payment of the second annual premium, application for reinstatement, and evidence of insurability satisfactory to the company made and received.   None of these prerequisites were discharged.

2.   The burden of proving a waiver was on the plaintiff.   His own oral testimony pertaining to the receipt of a letter written by the company, assuring the insured and plaintiff himself that the matter was fixed up, and for them not to worry, was altogether insufficient for that purpose.   It was incumbent on him to show that such letter was written by some one vested with authority to make the waiver.   Provision (4) under the head of "General Provisions," is a part of the contract.   Plaintiff should therefore have shown that the alleged letter was written by the president, vice-president or secretary. 2 Joyce on Insurance, § 539, and notes; 2 Bacon on

Insurance, § 589, and notes; 72 Ark. 62; 104 Ark. 512; 125 Ark. 119; 10 L. R. A. 517; 3 Cooley, Law of Insurance, 2513; 10 L. R. A. 577. Full effect should be given to the limitations and restrictions in insurance clauses prescribing by whom waivers may be made. 98 Pa. 384; 85 N. Y. 282; 57 N. Y. 500; 95 U. S. 326; 96 U. S. 234; 93 U. S. 24; 96 U. S. 572.

3. If it be granted that the letter was written, its contents were not such as constituted a waiver. The policy defined the consequences of default in the payment of premiums, i. e., that the policy should be *"ipso facto null and void."* It ceased to bind the company and to protect the insured, without any act or declaration on the part of the company. 112 Ark. 171. The restoration of the policies to life by reinstatement would be a new assurance, a new contract, though under the former policies. 10 L. R. A. 577; 25 L. R. (N. S.) 78. Where the contract is complete, the prohibition express, the failure admitted, the burden of proof is not only upon the party asserting the waiver, but he should be held to a clear and convincing proof of knowledge on the part of the insurer of all the facts necessary to establish a waiver. 24 U. S. Law. ed. 387.

*Botts & O'Daniel,* for appellee.

1. The letter relied on did not come from some agent of the company, but from the company itself. It comes too late for the appellant to raise the question for the first time on appeal of authority to write the waiver letter, and to say that it was not written by the proper parties, especially since it admits, and the proof shows, that the letter came direct from the company itself, and from its home office. The question of agency is not involved. 83 Ark. 575. If appellant had authority to delegate the question of waiver to its president, vice president and secretary, it had authority to effect such waiver itself. 111 Ark. 436; 25 Cyc. 861.

2. Forfeitures are not favored in law, and when an insurance company has, by its conduct or course of action,

led a policy holder to believe that his insurance is in full force, the company will be estopped from denying liability.    132 Ark. 549; 96 U. S. 841; 53 Ark. 494.

3.    The question of waiver was one of law.    25 Cyc. 861; 40 Cyc. 270.

4.    The burden of proving a waiver is met when the party pleading it establishes a waiver by a preponderance of the evidence, and he is not required to prove it by the clear and convincing evidence insisted upon by appellant. 40 Cyc. 269.

WOOD, J.    This is an action by the appellee against the appellant on two life insurance policies in the sum of $5,000 each, issued on the 8th day of May, 1920, insuring the life of Martha E. Scheuer for the benefit of the appellee, her husband.    Mrs. Scheuer died on August 28, 1921.    This action was brought by appellee on December 19, 1921.    The appellee, in his complaint, set up the policies, alleged the death of the insured and the proof of death, and demand on the appellant for $10,000, the amount of the policies, and the refusal by appellant to pay same, and prayed for judgment in that sum and for $600 damages on each policy, and a reasonable attorney's fee.

The appellant, in its answer, admitted the issuance of the policies as alleged, but denied that proof of death had been made, and denied that the policies were in effect at the time of the death of Mrs. Scheuer, but, on the contrary, alleged that, at that time, the policies had lapsed and were forfeited by the insured, and became null and void because of a failure to pay the premium which was due on May 8, 1921.    The appellant therefore denied liability to the appellee on the policies.

C. E. Condray testified that he was the cashier of the First National Bank of DeWitt, Arkansas.    After the death of the insured the appellee brought some policies to the bank and asked witness to collect them for him. Witness wrote the appellant, ten or fifteen days after Mrs. Scheuer's death, at its home office at Fordyce, Arkansas, advising it of the death of Mrs. Scheuer and

requesting a special form for making proof of death. Witness received a letter from the appellant, in reply to witness' letter, stating that Mrs. Scheuer's policies had lapsed because of the nonpayment of premiums. The policies in controversy were identified by witness and introduced in evidence. The policies contained, among other, the following provisions:

"(a)    All premiums are payable either at the head office of the company or to such agent as shall be designated by the company, upon delivery of a receipt signed by the president, vice president or secretary, and countersigned by the agent designated. If any premium or installment thereon is not paid when due, this policy shall be *ipso facto* null and void, and all premiums forfeited to the company, except as herein otherwise provided.

"(b)    Reinstatement of this policy, in event of default of premium payment, may be made, unless the cash surrender value has been paid, at any time, upon presentation at the head office of evidence of insurability, satisfactory to the company, and payment of all past due premiums, and the payment or reinstatement of any indebtedness to the company hereon or secured hereby, with interest at a rate not exceeding six per centum per annum.

"(c)    Only the president or vice president or secretary has power, in behalf of the company (and then only in writing), to make or modify this or any contract of insurance, or to extend the time for paying any premiums, and the company shall not be bound by any promise or representation heretofore or hereafter given by any agent or person other than above."

The appellee testified that one Colin Towler sold appellee and his wife $10,000 each of life insurance with the appellant. They dropped all other insurance and accepted insurance with the appellant. They paid Towler cash for the first premiums, that is, for $5,000 on witness' life, and for $5,000 on witness' wife's life. Towler issued a receipt when they paid him the money. The first premiums on the last two policies were paid in the

same way. Appellee and his wife executed notes for the last two premiums. Towler filled out the notes. Witness identified and introduced two receipts issued to Mrs. Scheuer, in the sum of $208.55, reciting that they were for the annual premium on the policy, and paid the same to May 8, 1921. These receipts were signed by Towler and countersigned by John R. Hampton, the secretary of the appellant. Witness testified to several receipts for payment of the premiums on his policy. The receipts were delivered to witness at the time the policies were delivered. All witness' dealings were with Towler. He took the cash payments, accepted the notes, and delivered to witness the receipts and policies. Towler was designated in the receipt as the agent. Witness never had any information from the appellant that Towler did not have authority to act for appellant in these transactions. Appellee sold to Towler eighty acres of land for $70 an acre. Towler said he would make the payments in the fall; that if he didn't have any money he would pay the insurance premiums. When the time came for paying the second premiums, appellee and his wife were anxious to know if they were paid. Towler had said, before the due date of the second premiums, that he would pay the same. About the 5th of May they gave blue notes for the second premiums. They aimed to give part of it in cash, and Towler said he would pay it, and appellee didn't know what a blue note was. Towler brought them to appellee. Appellee told Towler they wished to pay, and Towler said they had plenty of time—until the 8th of June. Appellee didn't have the notes in his possession, and didn't know where they were. There was a note for appellee and one for his wife in the sum of a little over $200. Appellee spoke about paying the balance of the premiums in cash, and Towler said there was no need to hurry about it—they had plenty of time to straighten it up. Mrs. Scheuer spoke to Towler about paying the cash part of the premiums, and he replied that he would straighten it up with the appellant, as the appellant owed him. Mrs. Scheuer got her check-book and insisted on

paying Towler the part of the second premiums that had to be paid in cash. He was reluctant to take it, and said, "Never mind." They had trouble getting Towler to fix it up. Finally they sent for him, and he came and brought the blue notes and filled out part of them there. Mrs. Scheuer offered two or three times to pay Towler the cash, telling him that she wanted it fixed up right, and he refused to take it. Appellee had no information from appellant that Towler didn't have authority to collect the second premiums like he had collected the first. After the notes were executed, Towler told appellee not to worry, that everything would be all right. After this some one told appellee that they could not depend on Towler, and they had better write the appellant. So Mrs. Scheuer wrote the appellant. Appellee didn't keep a copy of her letter—didn't have any idea he would need it. Mrs. Scheuer asked in the letter if Towler sent in the notes and if the insurance was "still going;" that she wanted to be sure about it, and, if it wasn't, they would send the money. She explained in the letter that they had fixed up the matter with Towler—had given notes—and asked when these notes were due. In the same letter she advised the appellant that they had been informed that they could not depend on Towler, and asked if their insurance was still in effect. They received an answer to Mrs. Scheuer's letter. Appellee didn't have this letter of the appellant, because, when they got sick, their stuff was moved out of the house. They searched for the letter everywhere, but couldn't find it. Appellee saw the letter. Appellant stated in this letter that Towler was its agent, and had fixed the notes up till November, and everything "would be all right—everything would be sure to go on—and not to worry." Towler got mad with them because appellee told him that they had been informed that he could not be depended upon. The appellant wrote them, before they made the notes, that the policies were due in June. That was the only notice they got. In response to that letter they went after Towler, and Towler fixed it up. They fixed it the way

Towler directed, and notified appellant that they had done so. After appellee's wife's death, on August 28, 1921, appellee requested Mr. Condray, the cashier of the First National Bank, to write the appellant, and gave him the policies to collect. The appellant had not paid any part of the policies. Towler had never paid appellee for his land purchased of appellee, and didn't even pay the taxes.

On cross-examination appellee stated, among other things, that they never paid anything toward the second annual premiums due on the policies. Appellee and his wife gave notes, and offered to pay them, and appellant would not take it. They offered to pay the premiums when the notes were made. The agreement with Towler was to pay the cash necessary. At the time the notes were executed, appellee and his wife looked to Towler to pay the cash deposit required. Before the second premiums were due, appellee and his wife were anxious to fix up the matter. They had a letter from the appellant, stating that the premiums would be due May 19, 1921. They then got after Towler, and he promised to fix it up, explained about the blue notes, and said that he would fix the receipt for it, and that it would be all right. Appellee had fixed up the payment of the first notes with Towler, and appellant had made no objection about that. After their agreement with Towler to make satisfactory arrangements for the second premiums, they became anxious about it, and Mrs. Scheuer wrote the letter as above stated. The answer of appellant to this letter, about which the witness had testified, was received in about a week or so after Mrs. Scheuer's letter was mailed. It was from the home office of appellant. In about two and a half or three months after they received appellant's letter appellee's wife died.  .

Towler testified, for the appellant, that he had been the agent of the appellant for three and a half years. His authority was only that of a soliciting agent—he took applications, etc. He took the applications for the policies in controversy. In payment of the first premiums

he took notes for half the premium, and the other half witness paid himself. When the policies were issued there was a land deal between witness and Scheuer. He had bought a piece of land from appellee, and had paid $500 on it, and was to pay the insurance premiums for the Scheuers from year to year, and the amount thus paid was to be credited on witness' indebtedness for the land. Such was the contract when the applications were made and the policies issued. Witness had promised to pay the second premiums of the Scheuers, on certain conditions in regard to the land deal, which the Scheuers did not comply with. The Scheuers knew that their insurance had lapsed on account of the nonpayment of the second premiums. Witness discussed the matter with them. They seemed to be anxious to reinstate it. Witness told them what was necessary to reinstate the policies—told them that it would be necessary for them to furnish a health certificate, showing the insured to be in good health, and also told them that a cash deposit would have to be made when the notes were delivered, if the appellant reinstated the policies. Witness continued his testimony as follows: ''I presented to Mr. Scheuer the blue notes, and at the same time I told him I would pay the cash deposit required, but I didn't do it, because he refused and failed to comply with his agreement with me, and I told him that if he didn't do this I was not going to do anything for him along the line of reinstating his policies, that I was through with it. After the notes were signed, I kept them in my possession; I never did send or forward the notes or any money as a cash deposit to the insurance company. I have had the notes in my possession ever since. Mr. Scheuer signed a health certificate eventually—that was some time in June after the execution of the blue notes.''

The testimony shows that Mrs. Scheuer signed the health certificate and gave it to the witness. The application for reinstatement and the certificate of good health signed by Mrs. Scheuer were introduced in evidence. A form of medical certificate, to be signed by the examining

physician, was also introduced, but was not signed by the medical examiner and approved by the medical director of appellant. The testimony of this witness further tends to prove that, after the nonpayment of the second premiums, an effort was made to compose the differences between witness and the Scheuers concerning the land, and, assuming that these differences had been adjusted, the witness, at the request of the Scheuers, and acting as their agent, went to the home office of appellant and told the bookkeeper that the Scheuers desired to reinstate their lapsed policies, and requested him to make up the amount of cash necessary to be paid, make up the blue notes to be executed, together with the certificates showing the insurability of the Scheuers. The bookkeeper complied with this request. These notes were executed by the Scheuers, but witness never returned the same to the appellant, nor was the cash paid by the witness, because, as he states, witness ascertained that the Scheuers had not complied with the conditions upon which he promised to make the cash payment necessary for the reinstatement of the policies. Witness did offer to accept the blue notes, and, if the Scheuers had paid the cash, he would have forwarded the notes to the appellant with the cash, and, if this had been done before the policies had expired, the insurance would have been extended. Witness knew that the Scheuers desired their policies reinstated, and he discussed the matter with the bookkeeper of the appellant, and told him that the witness thought he could reinstate the policies. Witness identified a letter which was written to him by the appellant from its home office at Fordyce, on its letter-head, dated July 25, 1921, as follows: "We have received another letter from Chas. Scheuer, and several days ago we wrote you in regard to this same matter. It is necessary that we give this party some reply, and will ask that you let us hear from you immediately upon receipt of this letter." Witness answered this letter on the back as follows: "I will let you know all about this matter within a few days, but my reasons for not doing so now

is because I want a settlement out of these people before I let you know about this matter, and then you can write them, and this will only be a few days." Stamped on this letter was the following: "Home Life & Accident Co. Received Aug. 1, 1921, A. B. Banks & Co., Managers."

Witness never explained to Mrs. Scheuer or said anything to her about not having anything more to do with the matter, after the failure to adjust the differences with appellee. She knew, however, that he was not going to take the land.

Witness Thatch testified that he was the superintendent of the life department of the appellant. He explained the provisions of the policies, and stated that, according to these provisions, if premiums were not paid within thirty-one days of grace allowed, the policy automatically lapsed. There was an effort made by the Scheuers to reinstate their policies. They asked the home office on what basis the policies might be reinstated, and the appellant informed them what was necessary. The notes were prepared in the home office, and the amount required in cash was figured out. No formal application was ever presented by the Scheuers for reinstatement to the home office, nor was there any medical certificate showing insurability after the policies had lapsed. The blue notes were never returned, nor the cash deposit. Witness identified the following letter, written by the Scheuers to the appellant, July 18, 1921: How about policies for Chas. and Martha Scheuer Nos. 18282, 17502, 18496 and 18497? Colin Towler, your agent, brought notes for us to sign for, now it was the blue notes, but he has acted the rascal with us in business matters and we feel we can't trust him. We don't want to lose out in the insurance. I have written you once before about this, now please let me know how we stand. We signed those blue notes and want to know if we are in good standing. Answer by return mail."

Witness answered this letter as follows: "Aug. 1, 1921. Mr. Chas. Scheuer, Stuttgart, Ark. Dear sir:

We had a letter from Mr. Towler today in which he advised us that he would talk to you within the next day or two with reference to your policy. If the conference you have with him is not satisfactory, please write us again.'' Witness didn't dictate the reply immediately after the letter of the Scheuers was received, but probably waited until he heard from Towler. The letter received from the Scheuers was the only one that witness knew anything about. If there was another letter, witness didn't know anything about it. Witness was not sure about writing any other letters, but if there was another letter received it would be in the files. All the correspondence with reference to the contract from the Scheuers was in the files, and witness found no other letter except the one introduced in evidence. Witness stated that the appellant might have waived the right to require a medical certificate and examination if the application for reinstatement and the notes and cash deposit had been received within a few days after the policies had lapsed.

The court, in substance, instructed the jury that the only evidence that would warrant a finding for the appellee was that part of the testimony of the appellee in which he testified that, after the execution of the blue notes and the agreement between him and Towler, he wrote the appellant a letter, making inquiry, and, in response to that letter, the appellant advised appellee that his insurance was in full force, and he need not worry; that, unless such letter was written by the appellant in reply to appellee's letter, and received by the appellee, the verdict should be in favor of the appellant; that, if such letter was written by the appellant and received by the appellee, it would operate, under the law, as a reinstatement of the insurance, and would constitute a waiver of every other condition in the policy and a ratification of everything that Towler may have done or promised to do, and would fix liability upon the part of the appellant; that, if the jury so found, its verdict should be in favor of the appellee in the sum of $10,000, less the amount of

the premiums that would be due on the policies for that year. The court further instructed the jury that the burden was upon the appellee to prove that the letter was written and received as stated. The appellant duly excepted to the rulings of the court.

The appellee requested, among others, the following prayer for instruction: "No. 2. You are instructed that, if you find for the plaintiff in this case for the amount claimed in his amended complaint, then you shall find in favor of the plaintiff in the sum of 12 per cent. as a penalty against the defendant, in addition to the amount due on the policies." The court refused this prayer, to which ruling the appellee excepted.

The appellant asked the court to instruct the jury to return a verdict in its favor, and also presented prayers for instructions in effect telling the jury that the policies had lapsed and were forfeited on the 8th day of June, 1921, and that the appellant was not liable unless the policies were reinstated, and that, unless they found the Scheuers had complied with the provisions of the policies concerning reinstatement, the verdict should be in favor of the appellant. The court refused these prayers, to which the appellant duly excepted.

The jury returned a verdict in favor of the appellee in the sum of $10,000, with six per cent. interest from the date of the proof of death, less the amount of the blue notes, with interest thereon at six per cent. from May 8, 1921, to date. Thereupon judgment was rendered in favor of the appellee in the sum of $10,439.26. The attorneys for the appellee moved the court to tax an attorneys' fee and a twelve per cent. penalty, and offered testimony by two reputable attorneys to the effect that a reasonable compensation to the attorneys for the appellee for services rendered would be between fifteen hundred and two thousand dollars. The court rejected this testimony, and overruled appellee's motion to tax an attorneys' fee and penalty. The appellant prosecutes this appeal from the judgment in favor of the appellee against it, and the appellee prosecutes here a cross-

appeal from the refusal of the court to tax a reasonable attorneys' fee and for a penalty of twelve per cent.

1.    Under the express provisions of the contracts of insurance, evidenced by the policies which are the foundation of this action, the nonpayment of the second premiums on the 8th day of June, 1921, *ipso facto* caused a forfeiture of appellee's rights under these policies. *Fidelity Mutual Life Ins. Co. v. Bussell,* 75 Ark. 25; *Patterson v. Equitable Life Assur. Society,* 112 Ark. 171; *Bobnett v. Cotton States Life Ins. Co.,* 148 Ark. 199; *Home Life & Acc. Co. v. Haskins,* 156 Ark. 77.    Upon the undisputed evidence, after these policies lapsed because of the nonpayment of the second premiums, there was no reinstatement thereof in compliance with the express provisions of the contract.    Therefore the court ruled correctly in so declaring the law; and the only question presented by this appeal is whether or not the court erred in refusing to grant appellant's prayer for a directed verdict in its favor.    The trial court, as we have seen, refused such prayer, but, on the contrary, instructed the jury, in effect, that, if the appellee, during the life of the insured, wrote to the appellant a letter inquiring whether the insurance was still in force, and the appellant, in reply thereto, advised the appellee, before the death of the insured, that the insurance was still in full force and that they need not worry, that such letter, if written, would constitute a waiver of the forfeiture, and render the appellant liable.    These rulings of the court, under the testimony, were likewise correct.

2.    We have set forth all the material facts bearing on these issues, and it could serve no useful purpose to reiterate them and argue them at length.    They speak for themselves.    Suffice it to say, whether or not Mrs. Scheuer wrote the letters referred to, inquiring whether the second premiums had been paid and whether the insurance was still in force, and whether the appellant received such letter and replied thereto, before Mrs. Scheuer's death, stating that Towler was its agent and that he had fixed up the notes until November, and that

everything was all right, and not to worry, were purely issues of fact. Learned counsel for appellant contends that the testimony of the appellee tending to establish the fact that Mrs. Scheuer wrote such a letter and received such an answer from appellant is not only inconsistent, but contradictory in itself. We do not concur with counsel for appellant in this view of the testimony. On the contrary, it occurs to us that the testimony of the appellee is not unreasonable, and, to say the least, when taken in connection with the testimony of Towler and Thatch, the duly authorized agents of the appellant in conducting the negotiations for the appellant resulting in the contracts of insurance, and the other letters in the record, which are established by the undisputed testimony, it fully justifies the conclusion that the letters were written as appellee testifies they were. But, even if the testimony were inconsistent and contradictory in itself, we are not the judges of the evidence and the credibility of the witnesses. It was for the jury to weigh all this testimony and reconcile the real, or apparent, conflicts. Certainly, it cannot be said that there was no testimony to warrant a finding by the jury that the letters were written, sent and received, as the appellee testified they were. *Eminent Household of Columbian Woodmen v. Heifner,* 160 Ark. 624. The verdict of the jury, where there is any substantial evidence to sustain it, is conclusive here. *Fowler* v. *Hammett, ante* p. 307, and cases there cited; *Gates* v. *Ritchie, ante* p. 484.

3. The policies provided that only the president, vice president or secretary of the appellant had power to make or modify this or any contract of insurance, or extend the time for the payment of premiums. The appellant contends that, under this provision of the policies, the appellee did not meet the burden of proof by showing that the alleged letter was written by the president, vice president or secretary of the appellant. The appellee testified that his wife wrote the letter to the appellant at Fordyce, and that they received, at Almyra, the alleged letter from the appellant, in reply thereto,

mailed from Fordyce. In other words, the testimony of appellee tended to show that his wife wrote the appellant and that the appellant answered the letter. There was no suggestion at the trial, either by cross-examination of the witness or by prayer for instructions, that this letter, if written, was not written by the president, vice president or secretary, the officers of the appellant having power, under the policy, to extend the time for payment of premiums and to reinstate policies of insurance. The testimony of the appellee was sufficient, in the absence of any contention or evidence to the contrary in the trial court, to warrant the jury in finding that the letter was written by the appellant, through its duly authorized officers and agents. Notwithstanding the above provision of the policies, Thatch, whose testimony shows that he was the superintendent of the life department of appellant and its underwriting manager, whose duty it was to pass on the reinstatement of lapsed policies, and who answered the letter of the Scheuers of July 18, 1921, concerning their standing with the appellant, would have had the right to waive the forfeiture of the policies, and by his conduct in the premises could have estopped the appellant from insisting on a forfeiture. *Industrial Mutual Indemnity Co.* v. *Thompson,* 83 Ark. 575; *Peebles* v. *Columbian Woodmen,* 111 Ark. 436; see *Woodmen of the World* v. *Newsom,* 142 Ark. 132, on rehearing.

It must be remembered that there is no testimony whatever in the record to the effect that the appellant did not write the alleged letter, which the appellee testified was received, bearing appellant's signature, and mailed from Fordyce, where appellant's home office is situated. On the contrary, Thatch testified concerning this: "I would have authority, I presume, to waive the application for reinstatement. Probably I never did notify Mr. or Mrs. Scheuer or Mr. Towler that these policies had lapsed." He nowhere denies that the letter was written which the appellee testified he received, and he does not testify that a letter was not written by the

appellant, advising the Scheuers that they were still in good standing, in reply to Mrs. Scheuer's letter of inquiry. We conclude therefore that the testimony was sufficient to warrant the jury in finding that the alleged letter was written by the appellant.

4. What was the effect of that letter on the contract of insurance? This letter shows clearly that it was not the purpose of appellant to insist upon a forfeiture of the policies because of the failure of the insured to pay the second premiums at the time same were due on June 8, 1921, the last day of grace. The letter of the Scheuers of July 18, making inquiry of appellant as to their standing, and the answer thereto, by the appellant, of August 1, 1921, and the letter of appellant to Towler, its agent, of July 25, 1921, all pertaining to these policies and relating to the question as to whether or not the policies were still in force, show that the appellant, at least as late as August 1, was not insisting on a forfeiture of the policies for the nonpayment of the second premiums. Mrs. Scheuer died on August 28, 1921. We are convinced that there was substantial testimony to warrant a finding by the jury that appellant, by this letter, intended to inform the Scheuers that these policies were still alive, and that it was the intention of appellant that they be kept alive until its agent, Towler, had perfected arrangements with the Scheuers for the continuation or reinstatement of the policies; or, at least, until they had had an opportunity to confer with Towler, and, if satisfactory arrangements had not been made, until Towler or the Scheuers notified the appellant to that effect. It is certain from the testimony that the Scheuers were anxious to keep these policies alive, and would have done everything required by the appellant, under the provisions of the policies, to reinstate the policies, possible for them to do, if they had been notified that their policies had lapsed, instead of being informed to the contrary. In the meantime, and without any further correspondence or notification in any manner that the policies had lapsed and were of no effect, Mrs. Scheuer died.

Forfeitures are not favored. It was the duty of the appellant, under the circumstances, to promptly answer the letter of the Scheuers and frankly tell them that their policies had lapsed, and that it would insist on a forfeiture, if such was its intention.

After a consideration of the whole record, we are convinced that the testimony was sufficient to warrant the jury in finding that the appellant had waived the forfeiture of the policies because of the nonpayment of the second premiums, and is estopped from asserting that it is not liable on the policies. The judgment therefore in favor of the appellee for $10,439.26, the amount of the policies with interest, less the amount of the second premiums, is affirmed.

5. The court erred in not granting the appellee's motion for penalty and attorneys' fee. Under our statute, and the pleadings and proof in the case, the appellee was entitled to recover a penalty of twelve per cent., together with a reasonable attorneys' fee. Section 6155, C. & M. Digest; *Queen of Ark. Ins. Co.* v. *Bramlett,* 103 Ark. 1; *Amer. Life Ins. Co.* v. *White,* 126 Ark. 483-494; *N. Y. Life Ins. Co.* v. *Adams,* 151 Ark. 123; *National Life Ins. Co.* v. *Sherrill,* 155 Ark. 381. The testimony on the motion to tax a reasonable attorneys' fee tends to prove that a reasonable attorneys' fee for the services rendered would amount to between $1,500 and $2,000. One witness stated that $1,500 would be a reasonable fee, and another that between $1,500 and $2,000 would be a reasonable fee. But we are of the opinion that the sum of $1,000 would be a reasonable compensation for the services rendered by appellee's counsel. The order of the court refusing to allow appellee the penalty and attorneys' fee is therefore reversed, and judgment will be entered here for a penalty of 12 per cent. on the amount of the judgment recovered below, and attorneys' fee in the sum of $1,000.