RUSH *v.* SMITH.

5-3611                                                      394 S. W. 2d 613

Opinion delivered September 20, 1965.

[Rehearing denied November 1, 1965.]

*Hardin, Barton, Hardin & Jesson,* for appellant.

*Thomas Harper* and *Franklin Wilder,* for appellee.

GEORGE ROSE SMITH, J. On April 23, 1962, the appellant, Virginia Rush, brought suit against her husband, Paul Rush, for a divorce on the ground of personal indignities. Three days later Paul Rush purportedly sold certain corporate stock to his sister, the appellee Frances R. Smith. Paul Rush was murdered on May 13, 1962. (Paul Rush's stepson, Fred Rush, was convicted of the murder, but we reversed the judgment and remanded the case for a new trial. *Rush* v. *State,* 238 Ark. 149, 379 S. W. 2d 29 [1964].) In June of 1963 Virginia Rush brought this suit to set aside the purported sale of the stock as a fraudulent transaction. After an extended trial the chancellor upheld the sale and dismissed the complaint for want of equity. The principal question here is whether the decree is against the weight of the evidence.

The facts must be narrated in some detail. Paul and Virginia Rush were married in 1949. For about seven years before their marriage they had been business associates in making furniture. They eventually organized two corporations, one of which operated a furniture manufacturing plant at Fort Smith and the other a similar plant at Waldron. Both Paul and Virginia Rush devoted their full time to the business, which prospered.

In 1957 about 61% of the stock in each company stood in Paul Rush's name. The other 39% was owned by third persons and is not involved in this case. In the year mentioned, 1957, the Rush 61% of the total stock was reissued in about equal shares to Paul and Virginia, he receiving a little less than 31% and she a little more than 30%. It is Paul Rush's part of the stock that is now in dispute.

As we have said, Virginia Rush filed suit for divorce on April 23, 1962, asserting that the parties had separated on April 20 of that year. The complaint asked that Virginia be awarded a half interest in all property that was owned jointly and in all property standing in Paul's name only, which would include the stock in question. Paul was served with a summons on April 24.

On April 26 Paul Rush and his attorney went to the First National Bank of Fort Smith, with which Paul did business, and ostensibly sold the stock to Paul's sister, Frances Smith. She, however, was not present. Rush and his attorney effected the purported sale with Sam B. Stevinson, the bank's trust officer. Paul Rush's stock appears to have been worth at least $200,000. Paul professed to sell this valuable stock to his sister Frances for its stated par value, which was $50,550. The bank purported to advance the purchase money as a loan to Frances, but it is evident that she never had dominion over the money or the stock. The bank retained the stock as collateral security for Frances's note for $50,550 (which she signed the next day). The bank deposited $550 of the purchase money to Paul Rush's account. It invested the remaining $50,000, at Paul's direction, in U. S. Treasury bills, which it held for Paul. Thus when the transaction was completed the bank had possession of the stock, the purchase money, and the Treasury bills. Paul had an added $550 in his bank account. Except for the fact that the stock had been reissued in her name Frances had nothing to show for her participation.

We think it almost too plain for argument that the supposed sale was in fact a sham that did not divest Paul Rush either of his ownership of the stock or of his control over it. A husband's colorable disposition of assets to defeat his wife's property rights in a pending or anticipated divorce suit may be found to be fraudulent. *Dowell* v. *Dowell,* 207 Ark. 578, 182 S. W. 2d 344 (1944); *Wilson* v. *Wilson,* 163 Ark. 294, 259 S. W. 742 (1924); *Austin* v. *Austin,* 143 Ark. 222, 220 S. W. 46 (1920). It cannot be doubted that Paul Rush's ostensible sale to his sister was intended to hinder Virginia Rush in the assertion of her property rights. In fact the banker, Stevinson, testified that he understood from his conversation with Paul Rush at the time of the sale that Rush hoped that the divorce suit would be withdrawn and that the sale of the stock would then be rescinded.

There are several other indications of a fraudulent intent. The transfer was to a close relative of Paul Rush.

*Farmers' State Bank* v. *Foshee,* 170 Ark. 445, 280 S. W. 380 (1926). The recited consideration was decidedly less than the value of the stock. *Smith* v. *Arkadelphia Milling Co.,* 143 Ark. 214, 220 S. W. 49 (1920). Paul Rush in effect retained possession of the stock, for we have no doubt that the bank would have cooperated in a rescission of the transaction. Continued possession by the vendor is a badge of fraud. *Wasson* v. *Lightle,* 188 Ark. 440, 66 S. W. 2d 652 (1933). It is not shown that Frances Smith was financially able to enter into a $50,550 purchase agreement. Finally, Paul Rush continued to act as general manager of the companies until his death, despite the fact that he had supposedly disposed of his interest in the business. After considering the proof as a whole we are convinced that the entire transaction was demonstrably a sham. Paul Rush was therefore the actual owner of the stock at his death. His widow is entitled to assert her claim to dower.

Other arguments made by the appellees merit discussion. There is testimony that Virginia Rush, soon after her husband's death, stated that he and she had divided their ownership of the corporations in 1957 and that thereafter neither had any interest in the other's stock. It is now insisted that these admissions by Mrs. Rush establish a valid postnuptial property settlement that precludes her from claiming dower in the corporate stock. We are cited to cases involving property settlements, such as *Godwin* v. *Godwin,* 231 Ark. 951, 333 S. W. 2d 493 (1960), and *Dunn* v. *Dunn,* 174 Ark. 517, 295 S. W. 963 (1927).

Virginia Rush's statements about the division of the stock in 1957 fall decidedly short of establishing a binding property settlement. The law has always been solicitous of a widow's dower. An antenuptial or postnuptial marriage settlement must be in writing. Ark. Stat. Ann. § 55-301 (1947); *Sims* v. *Roberts,* 188 Ark. 1030, 68 S. W. 2d 1001 (1934). Mrs. Rush's generalized references to the 1957 division of the stock do not indicate either that there was a written agreement or that it was intended to be in lieu of dower. We are unwilling to lay down a

precedent that a widow's right to a share in her husband's estate may be lost as a result of such vague admissions as those appearing in this record.

Next, a meeting of the stockholders in each corporation was held on June 21, 1962—about 40 days after Paul Rush's death. At that meeting the stockholders adopted a resolution reciting that Paul and Virginia Rush had owned, as tenants by the entirety, certain trucks used by the corporations. The resolution confirmed Virginia's ownership of this property as the surviving tenant by the entirety. There is no indication whatever that the recitations in this resolution were not true; so the appellees can derive no benefit from the fact that Virginia Rush accepted the trucks. She was entitled to them.

At this same meeting the stockholders also adopted a resolution reciting Paul Rush's so-called sale of his stock to his sister, pointing out that he was sane and solvent at the time of that transfer, and noting the fact that the stock had been reissued to Frances Smith and had been voted by her. The resolution concluded by declaring that the sale by Paul Rush to Frances Smith "be approved." All the stockholders, including Virginia Rush, signed this resolution. The appellees now rely heavily upon Virginia's joinder in the resolution as a basis for an estoppel against her present claim.

We are not impressed by this argument. It is plain that Mrs. Rush was not informed of her legal rights in the matter. Everyone else at the meeting, including the companies' lawyer, appears to have been hostile to Mrs. Rush. The very fact that such an unusual resolution was offered for her approval indicates pretty clearly that its proponents were attempting to strengthen their decidedly weak position. The meeting went on for four hours before Mrs. Rush finally joined in the resolution. She testified that she declined to approve the resolution until she had consulted a lawyer. It was suggested that she consult the bank's assistant trust officer, Charles Beasley, who was also an attorney. She did so, but he was (understandably, we think) unwilling to advise her about the resolution. She then discussed it with Stevinson.

who, according to her testimony, told her that the sale to Frances Smith was valid and could not be set aside. Her testimony is corroborated by Beasley himself, who states without contradiction that he heard Mr. Stevinson tell Mrs. Rush that he saw nothing wrong with her signing the resolution. In the circumstances Mrs. Rush's assent to the resolution was not a waiver of her rights, for she could not voluntarily abandon rights of which she was ignorant. *Sirmon* v. *Roberts,* 209 Ark. 586, 191 S. W. 2d 824 (1946). Nor is her conduct a basis for an estoppel, for there is no indication that anyone relied upon it to his detriment. *Schlumpf* v. *Shofner,* 210 Ark. 452, 196 S. W. 2d 747 (1946).

The appelles also argue with ingenuity (*a*) that Mrs. Rush cannot assert that the pretended sale was a fraud upon her right to a property settlement in her divorce suit, because that suit abated upon the death of Paul Rush, and (*b*) that Mrs. Rush cannot assert that the sale was a fraud upon her right to dower, because Paul Rush did not deliberately intend by the colorable sale to deprive his widow of dower. This argument is not sound. In the divorce case Paul's answer was a general denial, with no prayer for affirmative relief. Thus if Paul had lived and the case had been tried, Virginia would either have received her property rights if the divorce had been granted or would have retained her claim to dower if the divorce had been denied. Paul Rush's death had the effect, in the same instant, of abating the divorce suit and of bringing his widow's dower rights into choate existence. We are unwilling to say that in this instantaneous transition Mrs. Rush somehow lost her rights altogether.

It is also insisted that the bank, as administrator of Paul Rush's estate, was the proper plaintiff in a suit to set aside the fraudulent conveyance. Ark. Stat. Ann. § 62-2402 (Supp. 1963). We agree with the chancellor's conclusion that inasmuch as it is apparent that the bank would not have brought the suit it was proper for Mrs. Rush to bring it and to join the administrator as a defendant.

We reverse the decree and remand the cause for further proceedings. It appears that Mrs. Smith has paid interest to the bank upon her note. On the other hand, the principal of the loan represented by the note was invested in Treasury bills that seem to have provided income to Paul Rush or to his estate. These offsetting equities should be considered together in the final decree. It also appears that the two corporations have been liquidated and that, despite the disadvantages of a liquidating sale, more than $165,000 has been realized and paid into the registry of the court as liquidating dividends attributable to the stock now in dispute. The final order of distribution will adjust the equities to the end that neither Mrs. Smith nor the Paul Rush estate will reap a profit as a result of the abortive attempt to defeat Virginia Rush's rights. The court's purpose will be, as far as possible, to restore all concerned to their original position.

Reversed and remanded.

Supplemental opinion on rehearing P. 874.

HARRIS, C.J., and McFADDIN and WARD, J.J., dissent.

CARLETON HARRIS, Chief Justice (dissenting). I feel that this court is in error in reversing this case. The overwhelming weight of the evidence, in my opinion, is to the effect that Virginia Rush, from the beginning, recognized that she had no right to, or interest in, this stock. Charles Beasley, Vice-President and Trust Officer of the First National Bank of Fort Smith, Sam Stevinson, another vice-president, and Pauline Plummer, the only natural child of Paul Rush, all testified that Mrs. Rush had told them that she had made a settlement with her husband in 1957, and, at that time, Paul Rush had given her approximately one-half of all his stock in the corporations here involved as her full share of all property claims against him. I can see no reason for these people to misstate the facts, since all stood to gain financially if the transfer to appellee Smith were set aside. As an heir of the estate, Mrs. Plummer, of course, would get a much larger share from the estate if the stock sale be set aside, and likewise, of course, the First National Bank, administrator of the estate, would get a larger adminis-

trator's fee, if the size of the estate were increased. The statements of these witnesses are disputed only by appellant, and there are discrepancies in her testimony. It is also noticeable that Mrs. Rush waited over a year after her husband's death before instituting suit to set the sale aside. Likewise, her explanation for signing the resolution,. recognizing Mrs. Smith as the owner of the stock in question, is to the effect that she was pressured or coerced into signing. Again, we have only her statement, and this is denied by the others, except that, as pointed out in the majority opinion, Mr. Stevinson told appellant that he saw nothing wrong in her signing the resolution. I would hardly call such a statement pressure or coercion —and, since I am convinced that appellant originally recognized that she had no right to this stock, and the institution of the suit was based on an afterthought— I too would have to say that I see nothing wrong in her having signed the resolution.

In this case, we again have a situation where the Chancellor personally heard the testimony, observed the witnesses, and had every opportunity to notice their demeanor upon the stand, and to form his conclusions as to who was telling the truth. The trial court thus had an advantage that we do not have, and it is evident, from his decision, that he did not place full credence in all that was said by appellant.

I would affirm the case, and therefore, respectfully dissent. I am authorized to state that Justice McFADDIN joins in this dissent.

PAUL WARD, Associate Justice (dissenting). I agree with the majority in discarding five contentions made by appellees to affirm the decree of the trial court, but I am unable to agree with the one reason for reversing. As a ground for reversal the majority say: "After considering the proof as a whole we are convinced that the entire transaction was demonstrably a sham. Paul Rush was therefore the actual owner of the stock at his death."

There is no direct proof that Paul Rush never intended to sell the stock to his sister—no direct proof that the transaction was a sham. The trial court found it was

not a sham. If it was a sham, one of two conclusions must follow: either Paul Rush deceived his own attorney and the vice-president of the First National Bank of Fort Smith, or those two persons participated in the deception. There is, to my mind, convincing evidence that Paul Rush did in fact transfer the stock to his sister, Frances. She signed a note to the bank for $50,550 which the bank still holds. The vice-president testified Frances negotiated the loan to purchase the stock, and that he "personally gave her $50,550 in cash" (quote taken from the abstract). Frances testified she loaned Paul $5,000 to start the business, and that she was one of the original stockholders in the Rush Company and the Waldron Company; that Paul came to her home very much upset over the divorce action, and said he was going to sell his stock and get out of the business; that she tried to reason with him, telling him things might work out; she told Paul she couldn't buy the stock for what it shows on the books, and he said he never did have any faith in those figures; that they discussed the fact that the company was losing money, the effect of the divorce suit and the result of his leaving the company, and that she offered him par value for his stock. She further stated that she had kept the interest on loan paid, and that the stock certificates are in custody of the bank.

Under the above state of the record I feel that the **trial court's decree** is supported by the weight of the evidence, and that the decree should be affirmed.