THE NATIONAL INVESTORS LIFE
INSURANCE COMPANY *v.* Flora Mae TUDOR

78-52                                           571 S.W. 2d 585

Opinion delivered October 9, 1978
(In Banc)
[Rehearing denied November 6, 1978.]

*Davidson, Plastiras, Horne, Hollingsworth & Arnold, P.A.,* by: *Allan W. Horne,* for appellant.

*Travis Mathis,* for appellee.

GEORGE HOWARD, JR., Justice. We are to determine whether the verdict of the trial court, sitting without a jury, finding that appellant waived the requirement of reinstatement of a life insurance policy, after the policy had lapsed, resulting in a judgment in behalf of the appellee-beneficiary in the sum of $30,000.00, including 12% penalty and interest, and reasonable attorney's fee in the amount of $3,000.00, is supported by substantial evidence.

A verdict supported by substantial evidence dictates an affirmance on appeal while, on the other hand, a reversal is required where the evidence falls short of substantiality.

## THE FACTS

On December 14, 1970, appellant issued a reducing

term life insurance policy, number 25699, to the late Keith Tudor, husband of appellee-beneficiary, with a face amount of $50,000.00. A monthly premium, in the amount of $78.00, was required on the 14th day of each month under a pre-authorized check plan, hereinafter referred to as P.A.C. draft. [1]

A premium became due on March 14, 1975, and pursuant to the P.A.C. draft plan, a check was submitted to the insured's bank for payment, but the check was returned twice because of insufficient funds. On April 4, 1975, appellant mailed the following communication to the insured, stating in relevant part:

"Dear Mr. Tudor:

We have just received word that our check for the March 14, 1975 premium was not honored by your bank.

*We know how easily these things can happen — so rather than having us resubmit your check to the bank, will you please send another check or money order for $78.00 for premiums due?*

We know you don't want to lose the valuable coverage your National Investors policy provides, so it is to your advantage to send your payment today. This will assure the continuing security you get with National Investors and preserving this security is what we are all about." [2] (Emphasis added)

On May 7, 1975, Mrs. Tudor called Lynwood Richards

[1]An official of appellant testified that pre-authorized checks are checks that the policyholder has authorized the company to draw against the policyholder's bank account. As premiums become due, the checks are "generated by our computer and are deposited" on the date that the premium becomes due.

[2]The late Keith Tudor was the owner of the Southern Publishing Company of Arkadelphia, as well as the editor of the Southern Standard, a local newspaper, but because of illness, the business had been placed in the hands of an employee, Lynwood Richards. As a consequence, Mr. Richards would receive the mail at the business location and deliver the mail to the home of Mr. Tudor. However, the letter of April 4, 1975, from appellant was not received by the insured until May 7, 1975.

at the office of Southern Standard Publishing Company and requested him to send a check to appellant in the sum of $234.00, representing premiums for three months. On the same date, Lynwood Richards prepared a company check on Elk Horne Bank & Trust Company, Arkadelphia, Arkansas, dated May 7, 1975, and made payable to appellant in the amount of $234.00. Mr. Richards signed the check and placed the following words in the left hand corner: "March, April and May payments", but did not submit a policy number or designate the name of the insured. The check was a regular Southern Standard Publishing Company check containing the following address: 510-512 Main Street, Arkadelphia, Arkansas 71923. This check was received by appellant's premium accounting department on May 8, 1975. [3]

On May 15, 1975, appellee received the following communication from appellant dated May 13, 1975:

"Dear Mr. Tudor:

Your policy lapsed because the monthly premium due

---

[3]Mrs. Becky Robinson, an employee in the premium accounting department, testified that because of the company's name on the check, she assumed that the payment was for either a group, pension or mortgage policy, but after checking with these departments, she discovered there was no group, pension or mortgage policy under the name of Southern Standard Publishing Company. Five days later, May 13, 1975, the check was sent to Central Records Department for a policy number on Lynwood Richards, because he had signed the check, but it was discovered that there was no policy number under this name. Two days later, May 15, 1975, Mrs. Robinson called Southern Standard Publishing Company, after getting the telephone number from information, and Lynwood Richards gave her the insured's name and the following policy number: "18791" — this was a prior policy issued to the late Keith Tudor, but was no longer in existence because it lapsed prior to or during the year 1970. However, Lynwood Richards testified that he was certain that he gave Mrs. Robinson the following policy number: 25699.

With this information in hand, the $234.00 check was immediately deposited. But the following day, May 16, 1975, appellant's computer rejected the item indicating that the policy had been canceled. Central Records Department was requested to search for other policy numbers in the name of Keith Tudor and it was discovered that there was a policy numbered 25699. Appellant's computer indicated that this policy had lapsed, effective March 14, 1975. The matter was then referred to appellant's Policy Owner Service Department, according to Mrs. Becky Robinson, "for instructions for refund or reinstatement or whatever."

3-14-75 was not received.

I am concerned about this since termination of your policy will result in a loss to you, both financially and from a protection standpoint.

You can never replace this policy at the same low premium rate since premiums for life insurance are based on age at time of issue. This loss may be avoided if you apply for reinstatement.

We will consider restoring the full benefits of your policy if you will complete, sign and return the enclosed Application with your check for $234.00.

You may be able to change your method of premium payments or make a change in your policy to suit your present needs. Please contact me if you would like to discuss these changes."

On May 19, 1975, appellee called Mrs. Glenda Nash, representative in the Policy Owner's Service Department, who had written the letters of April 4, 1975, and May 13, 1975, and advised Mrs. Nash that she was somewhat surprised to receive the letter of May 13, 1975, inasmuch as premiums for three months had been mailed to appellant's office on May 7, 1975. However, Mrs. Nash was unaware of the $234.00 check sent by Mr. Richards and advised Mrs. Tudor that she would look into the matter and get back in touch with her.[4]

On May 27, 1975, the insured, Keith Tudor, died. The next communication received by appellee from appellant was a letter dated May 30, 1975, containing a refund check in the sum of $234.00, as follows:

"Dear Mr. Tudor:

---

[4]Appellee testified that Mrs. Nash had advised her, during the telephone conversation, that the policy had lapsed and consequently, the insured would have to execute an application for reinstatement. But appellee further testified that Mrs. Nash, upon being advised of the $234.00 check replied: "I guess your policy has lapsed." and that Mrs. Nash stated that she would look into the matter and that was the "way it was left."

Your policy lapsed on 3-14-75 because the bank draft was returned by your bank unpaid.

On May 13, 1975, I wrote you advising you that your policy had lapsed and we would need a completed reinstatement form completed and signed by you and returned to us with your check or money order for $234.00 before we could consider restoring the full benefits of your policy.

We received your check for $234.00. However, since we have not received the completed reinstatement application I am therefore returning your $234.00 to you.

Sincerely,

Mrs. Glenda Nash
Service Consultant"[5]

## HOLDING OF THE TRIAL COURT

The trial court rendered the following decision:

"[T]he Court is impressed with the fact that the policy by its face has lapsed as of March 14th of 1975 and that the notice thereof of April the 4th, 1975 was properly and in due time given. I'm likewise impressed that if the same current, proper handling had been made of the check of May the 7th, we would probably not have been here today.

"So, I'm finding that the actions waived the reinstatement provisions, and the policy was in force and effect on the date of the death of Keith Tudor. I believe this was the 27th?

. . .

---

[5]During the appellee-beneficiary's telephone conversation with Mrs. Nash on May 19, 1975, appellee advised Mrs. Nash that the late Keith Tudor was hospitalized, but she did not know the nature of the problem and that a series of tests were being conducted in order to determine the nature of his illness.

"Based on such finding, it would go without saying that there would be the twelve per cent penalty and reasonable attorney's fees. Reasonable attorney's fees will be found by the Court to be $3,000.00."

## THE DECISION

The central and controlling facts in this case are not in dispute, but only the interpretation of these facts generates the sharp differences of opinion between the parties.

Appellant emphasizes that the insurance policy extending the coverage on the late Mr. Keith Tudor provides, in relevant part, as follows:

". . . Only the President, a Vice President or the Secretary is authorized to change, modify or waive any of the provisions of the policy, and then only in writing."

Further, the appellant points out that the policy provides:

"REINSTATEMENT — If this policy lapses because of non-payment of premium, it may be reinstated at any time within 5 years after default in premium payment upon presentation of evidence of insurability satisfactory to the Company, and payment of all past due premiums with interest on such premiums from their respective due dates at the rate of 5% a year, compounded annually."

Thus, appellant argues, the record is void of any evidence that the above policy provisions have been complied with, and, more particularly, there is no evidence the president, a vice president or the secretary authorized any change or waived the reinstatement provisions and, as such, appellee has failed to establish a waiver of the reinstatement provisions. Accordingly, appellant contends, the trial court committed reversible error.

Appellant's argument is neither persuasive nor compelling for it is well settled that the agents or representatives of the life department, as here, of an insurance underwriter can

waive a forfeiture of a life insurance policy, although the policy provides that only the president, a vice president or secretary has power to modify or to waive provisions in a policy. *Home Life & Accident Co.* v. *Scheuer,* 162 Ark. 600, 258 S.W. 648 (1924).

Moreover, in *Millers Mutual Fire Insurance Company of Texas* v. *Russell,* 246 Ark. 1295, 433 S.W. 2d 536 (1969), which involves a fire insurance policy, we stated a provision in an insurance policy which is essentially for the benefit of the insurer can be waived only by the insurer through the conduct of its agent acting within the real or apparent scope of his authority.

We now turn to the evidence in the record before us to determine if there is substantial evidence to support the trial court's finding that the reinstatement requirements, under the policy, were waived by appellant through the conduct of its representatives.

First, it is well established that forfeitures are not favored and that courts are prompt to seize on circumstances which indicate a waiver on the part of an insurer or which will raise estoppel against it. *Union Life Insurance Company* v. *Pearl Brewer,* 228 Ark. 600, 309 S.W. 2d 740 (1958).

The evidence reflects that a P.A.C. draft was submitted to the insured's bank for the premium due March 14, 1975, which was returned for insufficient funds. On April 4, 1975, Mrs. Nash, Service Consultant for appellant, advised the insured "to send another check or money order" for the premium due. Pursuant to this request, a company check for $234.00, representing premiums for three months, was mailed by an employee of the insured on May 7, 1975. This check was received on May 8, 1975, in appellant's office. However, five days after this item had been received, appellant, for the first time, indicated an intention of forfeiting the policy in its letter of May 13, 1975, which was prepared 29 days after the 31 day grace period had expired, namely, April 14, 1975, and 22 days prior to a purported refund made by appellant and just three days after the insured's death.

However, appellant contends that the delay, in advising

the insured of the forfeiture and the necessity for an application of reinstatement, was due to appellant's inability to determine for whom the payment was intended and in ascertaining the policy number. This contention is not impressive in light of appellant's testimony about the sophisticated computer service readily available and which can report, in a matter of minutes, the status of a policy and even reveal whether the company has coverage for the person whose name appears, as here, on an item received. Furthermore, inasmuch as appellant's representatives did not see fit to place Mr. Richards' name in the computer, upon receipt of the check, to determine whether appellant had coverage on Mr. Richards, which was ultimately done days later, appellant could have easily learned the identity of the insured on the very day that the check was received by simply calling Lynwood Richards, whose name and address were contained on the check which, incidentally, was done some seven days after the check was received.

Further, it is clear from the evidence that appellant negotiated the $234.00 check and received the cash funds and retained these funds until three days after the insured's death. However, appellant seeks to justify the retention of these funds by asserting that these funds were placed in the "transit" or "suspense" file and were not placed with the company's general funds. The problem we have with this assertion is that no notice was given to appellee that the premium was being held in the transit or suspense file. Indeed, appellee had every reason to believe and assume that appellant had accepted these funds in payment of premiums due. It must be remembered that on May 19, 1975, the appellee called appellant's office and talked with Mrs. Nash and advised Mrs. Nash that premiums for three months had been mailed to the appellant's office on May 7, 1975, and Mrs. Nash stated that she was not aware of this fact and further stated "I guess your policy has lapsed." Mrs. Nash then told appellee that she would look into the matter and get back in touch with appellee. Moreover, appellee testified, and Mrs. Nash admitted, that she advised Mrs. Nash that the insured was in the hospital and the nature of his illness was unknown.

After a careful consideration of the whole record, we are persuaded that there is substantial evidence to support the holding of the trial court. Furthermore, it must be remembered that it was the responsibility of the trial judge, sitting without a jury, to weigh the evidence, determine the credibility of witnesses and reconcile real or apparent conflicts in the evidence.

Affirmed.

GEORGE ROSE SMITH and FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. For over 30 years this court has accepted and applied a definition of waiver adopted in *Sirmon* v. *Roberts,* 209 Ark. 586, 191 S.W. 2d 824. We said:

> *** A definition of "waiver" found in the Corpus Juris citation [67 C.J. 291] is " * * * the voluntary abandonment or surrender, by a capable person, of a right known by him to exist, with the intent that such right shall be surrendered and such person forever deprived of its benefits; or such conduct as warrants an inference of the relinquishment of such right, or the intentional doing of an act inconsistent with claiming it. Thus, 'wavier' occurs where one in possession of a right, whether conferred by law or contract, with full knowledge of the material facts, does or forbears to do something, the doing of which or the failure or forbearance to do which is inconsistent with the right or his intention to rely upon it."

See *Keith* v. *City of Cave Springs,* 233 Ark. 363, 344 S.W. 2d 591; *Rush* v. *Smith,* 239 Ark. 874, 394 S.W. 2d 613; *Franklin and Reid* v. *State,* 251 Ark. 223, 471 S.W. 2d 760; *Ray Dodge, Inc.* v. *Moore,* 251 Ark. 1036, 479 S.W. 2d 518; *Griffith Lumber Co.* v. *Connor,* 255 Ark. 623, 502 S.W. 2d 500.

There is nothing in this definition or in our cases that requires the use of a different definition when an insurance company is alleged to have waived a right. The trial court and the majority have somewhere found evidence of a *volun-*

*tary* abandonment or surrender of a right known by the company to exist, with the *intent* that such right be surrendered and that it be forever deprived of its benefits. There certainly is no evidence of an express waiver. So, if there is a waiver, it must be implied. But there must be evidence of such conduct as *warrants* an inference of the relinquishment of such right, or the *intentional* doing of an act inconsistent with claiming it. Under the definition we use, before there can be waiver, the party charged must have *full knowledge of the material facts*.

We pointed out in *Sirmon* that conduct relied upon to establish waiver must be carefully inspected and all evidence bearing upon the subject impartially scrutinized. See also, *Ray Dodge, Inc.* v. *Moore,* supra. Where is the evidence of conduct that warrants an inference that the insurance company voluntarily abandoned or surrendered its right? Or that it acted with full knowledge of the material facts? Even a microscopic examination of the abstract of the record and of the majority opinion does not reveal it. Nothing is shown except a state of confusion for which the company was in no way responsible, and to which its employees reacted in a normal, human manner, which, through the lenses of hindsight, does not seem perfect to the majority. Imperfection is typical of all human actions when viewed in retrospect. To say that the company's employees could have looked in another direction for a clue to the mysterious payment instead of going in the direction they did is certainly not substantial support for finding a voluntary and intentional abandonment or surrender of á right, or an intentional doing of an act inconsistent with the right, or that the employees had full knowledge of the material facts. The employees of the insurance company had nothing whatever to do with the creation of the mystery with which they were confronted or the confusion with which they were confounded.

Even-handed justice calls for a reversal of the judgment in this case.

I am authorized to state that Mr. Justice George Rose Smith joins in this opinion.